IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM K. KENNEDY, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| vs. | : | No. 05-CV-5186 |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of the | : | |
| Social Security Administration, | : | |
| Defendant | : | |

<u>REPORT AND RECOMMENDATION</u>

TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE

　　Plaintiff William Kennedy seeks review of the Commissioner's denial of Supplemental Security Income ("SSI") based on the decision of an Administrative Law Judge ("ALJ").  The ALJ concluded that although Kennedy has severe impairments, he is not disabled.  This decision was based on a thorough review of the record and is supported by substantial evidence. Accordingly, I respectfully recommend the Commissioner's motion for summary judgment be granted and Kennedy's motion be denied.

　　The primary issue is whether the ALJ properly relied on expert medical testimony concluding Kennedy's mental health impairments were primarily due to substance abuse. Although it is a close question, the ALJ had substantial evidence to support his decision that any evidence that would render Kennedy's mental health impairments disabling was tied to episodes of substance abuse that were successfully treated.

<u>PROCEDURAL HISTORY</u>

On October 21, 2002, Kennedy alleged disability beginning on July 28, 2002,[1] due to substance abuse, asthma, and a lung injury.[2]  The state agency denied the application.  (Tr. 109). On May 19, 2003, Kennedy requested a hearing before an ALJ because he was not at full strength and his breathing had become worse.  (Tr. 107).  On August 26, 2003, the ALJ continued the hearing, until August 18, 2004, so Kennedy could obtain counsel.  (Tr. 278-283). Testimony was received from Kennedy, who was represented by counsel, Richard Saul, M.D.,[3] and vocational expert Patricia Scutt.  (Tr. 286-318).  On September 16, 2004, the ALJ denied Kennedy's claim, finding Kennedy can perform a restricted range of light work.  (Tr. 32-39).  The Appeals Council denied Kennedy's request for review on September 2, 2005.  (Tr. 4-6).

FACTUAL HISTORY

A.  Introduction

Kennedy was 45 years old at the time of the ALJ decision.[4]  (Tr. 37, 191, 265).  He completed a general equivalency diploma in August, 1995.  (Tr. 130).  He has a past relevant

---

[1] Kennedy completed two nearly identical forms dated October 21, 2002.  One form lists September 16, 2002 as his disability date, while another form lists July 28, 2002.  Both forms list September 16, 2002 as the date he stopped working.  (Tr. 124, 134).

[2] Kennedy's application for disability did not list any mental impairments as a basis of disability.  (Tr. 124-142).  Kennedy did list "mentally stress" under the "Remarks" section of his application.  (Tr. 141).

[3] Dr. Saul has 33 years of experience, is board certified in psychiatry, and currently serves as clinical director of the psychiatric division of the Philadelphia Court of Common Pleas and as clinical associate professor of psychiatry at Temple University.

[4] Kennedy is considered a "younger person" under the Commissioner's regulations.  See 20 C.F.R. § 416.963(c).  Age is considered one of the relevant factors in determining whether a claimant can adjust to other work in the national economy.  Advancing age is an increasingly limiting factor in a claimant's ability to make such an adjustment.  20 C.F.R. § 416.963(a).

work history as a waiter, busboy, metal grinder, spot welder, carpet cleaner, general laborer, and tire repairman.[5]  (Tr. 125, 135, 143-150, 288).  Kennedy's living arrangements have varied from the alleged date of disability to present.  Kennedy testified he lives alone, (Tr. 292); however, on January 28, 2003, he told Dr. Brad Rothkopf, he lived with his fiancee and two children, (Tr. 206); on September 25, 2003, he told staff at WES Health Center ("WES") his aunt was moving in with him, (Tr. 240); and, on May 5, 2004, he told Dr. Carl D. Herman, he lived with his female cousin, (Tr. 231).  Moreover, Kennedy has been hospitalized several times for substance abuse.[6]  (Tr. 190, 205, 221-230).  His symptoms include poor sleep, depressed mood, occasional auditory hallucinations, anxiety, paranoia, trouble breathing, chest pain with exertion, weakness, and fatigue.  (Tr. 287-295).  Kennedy has no problems maintaining personal hygiene and doing his own household chores.  (Tr. 292).  He watches television, has an occasional girlfriend, occasionally uses public transportation, sometimes shops at a nearby corner store, and is able to walk 10 blocks without stopping.  (Tr. 291-293, 155).  However, his sister does the grocery shopping for him.  (Tr. 292-293).

    B.  Medical Evidence

        1.  Lung Impairments

---

[5] These are the only jobs he listed on his application for disability benefits.  At various times Kennedy told doctors he was a freelance carpenter, (Tr. 222), he does odd jobs to support himself, (Tr. 227), he regularly worked as a self-employed bricklayer and carpenter for 20 years, until December, 2002, (Tr. 231), he was formerly a professional boxer, (Tr. 206), he began restoring his second house with his cousin, (Tr. 240, 241), and he previously ran a nightclub with his friend (Tr. 224).

[6] His admission to the Belmont Center for Comprehensive Treatment in March, 2004 was for depression, decreased concentration, poor sleep, poor appetite, sadness, and hallucinations, in addition to alcohol and cocaine dependence.  (Tr. 221).

On July 28, 2002, Kennedy[7] was admitted to Temple University Hospital for multiple stab wounds[8] to the left chest.  (Tr. 163-165).  Chest x-rays showed no pneumothroax or hemothorax and no foreign body in the pleural space.[9]  Kennedy underwent a right and left chest tube thoracostomy.[10]  (Tr. 164-165).  In addition, Kennedy underwent surgery to remove a small portion of his left lung.  (Tr. 181).  Before being released to inpatient rehabilitation for chemical dependency from August 2, 2002 to August 30, 2002, Kennedy was deemed capable of performing normal activities.  (Tr. 124, 165, 190).

After completing rehabilitation, Kennedy took a job for one week, quitting on September 16, 2002 because he found it too difficult.[11]  (Tr. 124).  Kennedy applied for Supplemental Security Income on October 21, 2002.

On December 24, 2002, Dr. Allan Koff performed a consultative examination in

---

[7] I note the discrepancy in Kennedy's records from Temple University Hospital.  The records constitute 26 pages, 12 of which have the name "Kendall Freeman" at the top.  (Tr. 164-165, 169, 180-189).  On March 31, 2006, a telephone conference was held with the parties to discuss the discrepancy.  According to Kennedy's attorney, the records naming Kendall Freeman are those of Kennedy.  Kennedy's middle name is Kendall and his step-father's surname is Freeman.  The Commissioner does not contest this representation.

[8] The record is unclear as to who stabbed Kennedy, and he has provided multiple accounts of the incident.  According to Dr. Rothkopf, Kennedy was robbed and stabbed coming home from a bar after a night of heavy drinking.  (Tr. 205).  The June 29, 2003 notes from WES indicate Kennedy was stabbed by his girlfriend.  (Tr. 250).  According to Kennedy's testimony, his wife stabbed him.  (Tr. 288).

[9] Pneumothorax refers to air in the pleural space.  Dorlands Illustrated Medical Dictionary (30th Ed.) ("Dorlands"), p. 1467.  Hemothorax is blood in the pleural space.  Dorlands at 836.

[10] A thoracostomy is a surgical procedure creating an opening in the wall of the chest, with the insertion of a tube for drainage of air or fluid from the pleural space.  Dorlands at 1905.

[11] Kennedy told Dr. Herman he worked regularly until December, 2002, (Tr. 231), but nothing in the record supports this claim.

4

connection with Kennedy's application for benefits, noting Kennedy was "awake, alert and oriented," with "no confusion." (Tr. 192). Kennedy informed Dr. Koff that most of the time the environment causes his asthmatic conditions, which "decreased to almost zero" when he left a work environment that included metal shavings and dust. (Tr. 192). Dr. Koff heard only a "few crackles" in Kennedy's lungs that partially cleared with cough. (Tr. 192). A pulmonary study revealed Kennedy was unable to take a maximum breath which did not improve even after his air passages were expanded. (Tr. 192). Dr. Koff said Kennedy should be evaluated for other conditions from his asthmatic bronchitis and lung surgery, and asked to see a chest x-ray.[12] (Tr. 192). Almost a year later, on November 13, 2003, Dr. Koff was unsure if Kennedy had irreversible lung disease. (Tr. 219).

On February 21, 2003, Dr. Michael Lippman interpreted a pulmonary function test and found Kennedy's breath levels to be consistent with "moderately severe obstructive pattern." (Tr. 204). Unlike Dr. Koff, Dr. Lippman found Kennedy's condition improved when his air passages were artificially expanded. (Tr. 204).

Dr. Rothkopf examined Kennedy on January 28, 2003. While taking Kennedy's history, Kennedy informed Dr. Rothkopf he could walk a good distance. (Tr. 205). Kennedy said his primary care physician had deemed him fit following a chest x-ray and studies. (Tr. 205). Dr. Rothkopf reported that Kennedy "seemed to outgrow" most of his asthmatic condition, using an inhaler on an as-needed basis, and very rarely using a device creating an aerosol spray for inhalation. (Tr. 205). However, Kennedy experienced severe fatigue after four to five hours

---

[12] On January 20, 2003, a radiology report, approved by Drs. Chul Kwak and Renee Kendzierski, indicated "bilateral pleural thickening with linear scarring at left base." (Tr. 268). The report was based on comparing prior chest studies with current x-rays. (Tr. 268).

while working for a temporary agency.  (Tr. 205).  Kennedy told Dr. Rothkopf he experiences

chest pain, presenting as a "pins and needles" feeling, on his left side when he tries to lift objects

or take deep breaths.  (Tr. 206).  Dr. Rothkopf noted Kennedy was alert, made good eye contact,

was in no distress, and had normal mental status.  (Tr. 206-207).  Kennedy's lungs were clear,

with decreased breath sounds in the right lower lung.  (Tr. 207).  Dr. Rothkopf noted further

tests, x-rays, and notes from primary treating sources would be helpful in determining Kennedy's

capabilities.  (Tr. 208).

Using a check-the-box form, Dr. Rothkopf determined Kennedy could frequently lift and

carry two to three pounds; occasionally lift and carry 20 pounds; and had no limitations on

standing, walking, sitting, pushing, pulling, postural activities, or environmental conditions.  (Tr.

209-210).

### 2. Mental Impairments

Prior to July 29, 2003, Kennedy has no record of mental health treatment, other than

rehabilitation for substance abuse.  On July 29, 2003, Kennedy was referred by his primary care

physician to WES because of trouble sleeping, nightmares, and not wanting to leave the house or

answer the phone.  (Tr. 250).  Kennedy attributed these troubles to his stabbing, claiming the

assailant continued to threaten him.  (Tr. 250).  Though Kennedy preferred to be alone, he

confirmed he could get along with others.  (Tr. 257).  Kennedy reported no prior inpatient

psychiatric hospitalization or outpatient mental health services.  (Tr. 252).   He had poor eye

contact, a sad affect, and thoughts of worthlessness.[13]  (Tr. 261).  Kennedy's Global Assessment

---

[13] The WES notes contain conflicting information concerning whether Kennedy had
homicidal thoughts.  One note indicates intense homicidal thoughts began at age 43,  (Tr. 259),
while another indicates the absence of homicidal thoughts, (Tr. 260).

of Functioning ("GAF") score was 45,[14] and one of his noted strengths was his intelligence.  (Tr. 263).  Additionally, Kennedy said his future employment goal was to "get back to work."  (Tr. 258).  Kennedy was diagnosed with post traumatic stress disorder ("PTSD") and prescribed an antidepressant.  (Tr. 262, 249).

Kennedy was scheduled for weekly psychotherapy sessions at WES, but he failed to attend, as prescribed.  (Tr. 246).  Kennedy attended only eight sessions in five months, from August, 2003, through December, 2003.  (Tr. 236-243).  No suicidal or homicidal thoughts, auditory hallucinations, or visual hallucinations were recorded during any session.  (Tr. 236-243).  Kennedy's medication was changed from one antidepressant to another,  (Tr. 248),  resulting in decreased depression, fewer flashbacks, cessation of panic attacks, and improved sleep by October, 2003.  (Tr. 238).  Nevertheless, on December 2, 2003, he continued to report feeling anxious, worried, and down because his children's mother left him "evil" messages.  (Tr. 236).

In March, 2004, Kennedy was hospitalized at the Belmont Center for Comprehensive Treatment for homicidal thoughts about his ex-wife.[15]  (Tr. 221, 226).  He reported feeling depressed, paranoid, being unable to sleep, having nightmares and flashbacks, feeling hopeless and helpless, lacking energy, having suicidal thoughts, and hearing voices telling him to kill his

---

[14] This score is a subjective determination of the physician's judgment based (on a 100 point scale) on Kennedy's overall function on that particular day, excluding physical and environmental impairments.  A GAF score in the 41-50 range indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  Diagnostic and Statistical Manual of Mental Disorders IV-TR, ("DSM IV-TR") p. 34 (4th ed. 2000).  A physician's estimated GAF score of a claimant's overall level of functioning ability may assist the ALJ, but is not essential to resolution of the claim.  Howard v. Commissioner, 276 F.3d 235, 241 (6th Cir. 2002).

[15] Kennedy said his ex-wife had stabbed him on July 28, 2002.  (Tr. 226).  As previously recounted, he gave three accounts of this incident.

wife.  (Tr. 226).  Kennedy admitted he had been using cocaine two to three times a week,

drinking a six-pack of alcohol a day, and using Xanax, an anti-anxiety drug he had not been

prescribed.  (Tr. 226).  Nevertheless, Kennedy said he had not regularly taken Lexapro, his

prescribed anti-depressant, because he feared becoming dependent upon it.  (Tr. 227).  At

admission, Dr. Thomas Brouette assigned Kennedy a GAF score of 20.[16]  (Tr. 228).  During

inpatient treatment, Kennedy was once again given Lexapro, which resulted in his active

participation in group therapy and "much" improvement in his depressive symptoms, and

Zyprexa,[17] which resulted in "good control of his psychotic symptoms." (Tr. 229).  At discharge

on March 15, 2004; Kennedy had a GAF score of 65;[18] was prescribed Lexapro and Zyprexa; and

was diagnosed with recurrent major depressive disorder with psychotic symptoms, PTSD,

alcohol dependence, and cocaine dependence.  (Tr. 230).

Six days later, on March 22, 2004, Kennedy was readmitted to Belmont with a chief

complaint of "I want to kill her."  (Tr. 221).  Kennedy admitted drinking about a six pack of

alcohol per day, inhaling a twenty dollar-bag of cocaine, and smoking marijuana for the two days

prior to admission.  (Tr. 222).  Kennedy reported paranoid thoughts and hearing voices recurred

two days after being discharged on March 15, 2004.  (Tr. 221).  Near the end of hospitalization,

---

[16] A GAF score in the range of 11-20 indicates some danger of hurting oneself or others, occasionally fails to maintain minimal personal hygiene, or gross impairment in communication. DSM IV-TR at 34.

[17] Zyprexa is the trademark for olanzapine, Dorlands at 2080, which is used as "an anti-psychotic in the management of schizophrenia and for short-term treatment of manic episodes in bipolar disorder."  Dorlands at 1304.

[18] A GAF score in the range of 61-70 indicates "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM IV-TR at 34.

Kennedy's Zyprexa and Lexapro were increased, and he began to feel much better.  (Tr. 224).

Kennedy was also able to interact "much" more with his peers.  (Tr. 224).   At discharge, on

April 5, 2004, Kennedy's GAF score had risen from 20 to 60, (Tr. 223, 225), and his diagnosis

was the same as on March 15, 2004, with the addition of marijuana abuse and the opinion that

Kennedy's symptoms precluded him from living in his own home.  (Tr. 224-225).

     On May 5, 2004, Kennedy saw Dr. Herman, (Tr. 231), who diagnosed him with

prolonged PTSD and alcohol dependence in remission for 90 days.  (Tr. 231-232).  Dr. Herman

described Kennedy as well-groomed, possessing excellent hygiene, neatly dressed, and

cooperative.  (Tr. 231).   Using a check-the-box form, Dr. Herman said Kennedy had no

impairment in understanding and remembering short, simple instructions and no limitation in

carrying out short, simple instructions.  (Tr. 234).  Dr. Herman noted marked limitations in the

ability to carry out detailed instructions, in making judgments on simple work-related decisions,

and in interacting appropriately with the public.  (Tr. 234).  He noted extreme limitations in

Kennedy's ability to interact appropriately with supervisors and co-workers and in his ability to

respond to work pressures.  (Tr. 234).

    C.  <u>Hearing Testimony</u>

     Kennedy described his employment history as "sketchy" because he did not like to be

around other people.  (Tr. 287).  He testified he was nervous around people before his stabbing[19]

and his nervousness continued after the stabbing.  (Tr. 287-288).   Kennedy stays home most of

---

[19] Kennedy testified he was able to work in the "metal place" because he had his own area
where no one was around him.  (Tr. 288).

the time, only leaving the house to shop at the corner store or attend meetings at Belmont.[20]  (Tr. 291, 293).  While home, Kennedy watches television and has his girlfriend visit.  (Tr. 293).  Because of his aversion to others, he has no friends, he only occasionally takes public transportation, he lives alone, and his sister shops for his groceries.  (Tr. 292-293).  However, he is able to take care of his personal needs while at home.  (Tr. 292).  When using public transportation, Kennedy will let a crowded bus pass, and either stands by the door or rides in the back of the bus so that no one is behind him.  (Tr. 292).

Kennedy reported he has trouble sleeping.  (Tr. 293).  At night, Kennedy hears voices of, and sees, his friend, Kevin, who killed his wife and himself several years ago.  (Tr. 293-294).  The voices tell him to kill his ex-wife.  (Tr. 293-294).  These "visits" scare Kennedy because he is afraid of what he might do and afraid of being stabbed again.  (Tr. 294).  Sometimes the voices overcome him with panic and paranoia, causing him to "run up and down ... [and] check the door five or six times at night."  (Tr. 295).

Kennedy testified the last job he held was as a welder, which he left because of his asthma.  (Tr. 287).  After the stabbing, his asthma got worse, causing his doctor to increase his asthma medication.  (Tr. 288-289).

After reviewing Kennedy's medical evidence, Dr. Saul testified as a neutral psychiatric expert at the request of the ALJ.  (Tr. 295-301).  Dr. Saul testified Kennedy's admissions to Belmont involved substance abuse as a significant factor in Kennedy's mental health problems, resulting in hallucinations.  (Tr. 297-298).  Dr. Saul noted Kennedy had used drugs and alcohol

---

[20] At the meetings, he sometimes becomes defensive and he "just corner[s] ... and shut[s] down."  (Tr. 295).

before complaining of homicidal thoughts toward his wife.  (Tr. 296).

Kennedy's restrictions on activities of daily living, difficulties maintaining social functioning, and difficulties maintaining persistence and pace are moderate.  (Tr. 297-298).  Dr. Saul recognized that although Kennedy does not like to be around people, he does have a girlfriend and is able to interact with her.  (Tr. 297).  Dr. Saul disregarded Dr. Herman's report, because Kennedy's medical evidence does not support the level of severity Dr. Herman attributed to Kennedy's aversion to social interaction.  (Tr. 298-299).  Dr. Saul testified Kennedy should work in "a more solitary kind of job" with not "much contact with the public."  (Tr. 299).

Vocational expert Scutt classified Kennedy's previous jobs, and answered the following hypothetical:

> An individual could lift 20 pounds occasionally, ten frequently.  Could stand and/or walk for a total of six hours in an eight-hour day.  Could sit for a total of six hours in an eight-hour day.  Must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  Also must avoid concentrated exposure to temperature extremes, wetness, humidity.  And the following mental assumptions are no complicated tasks.  Simple decision making only.  Requires a low stress environment.  Requires a stable work environment in which there are no more than occasional changes in tools, procedures, and work settings.  Occasional ability to interact with co-workers and supervisors.  No ability to interact with the public.  Occasional lapses in concentration.

(Tr. 303).  She concluded the individual in the hypothetical could not work at any of Kennedy's previous jobs.  (Tr. 303-305).  She testified there are two jobs, with 5,200 positions available in the Philadelphia area, such person would be able to perform: small products assembler and inventory clerk.[21]  (Tr. 305).

On cross-examination, Scutt clarified the job requirements of small products assembler

---

[21] If the person could have no interactions with coworkers or supervisors and frequent lapses in concentration, however, Scutt said the person could not work.  (Tr. 305).

and inventory clerk.  (Tr. 306-314).  She said each job would involve occasional interaction with others, occasional interaction with a supervisor, simple one- or two-step instructions, and the person would be in the presence of other people.  (Tr. 306-314).  Scutt also testified that like his job as a spot welder, Kennedy would have his own space, working on his own.  (Tr. 309-310).

   D.  ALJ's Decision

   The ALJ thoroughly reviewed the record and considered all the evidence.  He deemed Kennedy's chronic obstructive pulmonary disease, asthma, affective disorder, anxiety-related disorder, and substance abuse severe impairments, which did not meet or medically equal one of the impairments found on the Listing of Impairments.[22]  (Tr. 38, Finding No. 2).  The ALJ found Kennedy's mental impairments resulted in moderate limitations in "activities of daily living, social functioning, and concentration, persistence, or pace, and three episodes of decompensation."  (Tr. 38, Finding No. 3).  Kennedy could not perform his past relevant work, (Tr. 38, Finding No. 6), but retained the residual functional capacity ("RFC") to perform a restricted range of light work activity with the following restrictions: avoidance of concentrated exposure to environmental pollutants; the capacity to sit or stand for only six hours in an eight-hour day; no interaction with the public; and only occasional interaction with coworkers and supervisors.  (Tr. 38, Finding No. 5).  Using the testimony of the vocational expert and the

---

   [22] The Listing of Impairments is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background.  Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  The Listing defines impairments that would prevent an adult, regardless of age, education, or work experience, from performing "any" gainful activity, not just "substantial" gainful activity.  See 20 C.F.R. § 416.925(a) (purpose of the listings is to describe impairments severe enough to prevent a person from doing any gainful activity).  The Listing was designed to operate as a presumption of disability making further inquiry unnecessary.  Sullivan v. Zebley, 493 U.S. at 532.

Medical-Vocational Guidelines[23] (the "grids") as a framework for decision-making, the ALJ found there are a significant number of jobs in the national economy which Kennedy could perform, and therefore, he is not disabled.  (Tr. 39, Findings No. 10 and 11).

The ALJ accepted Kennedy's subjective evaluation of his asthmatic and other lung conditions to the extent it limits his activities, but does not render him unable to work.  (Tr. 35). The ALJ found Kennedy's treating physicians contradicted Kennedy's complaints that his asthma had become worse.  (Tr. 35).  Kennedy's asthma was controlled and had not merited emergency room treatment in many years.  (Tr. 35).  Further, the ALJ relied on pulmonary studies which found Kennedy had only moderately severe obstructive pattern, (Tr. 35), and September 6, 2003 treatment notes that Kennedy could resume normal activities, (Tr. 265).  The ALJ also found Kennedy's ability to do housework, laundry, cook, and minor repairs discredited his claim that he is totally unable to work.  (Tr. 35).

The ALJ did not fully accept Kennedy's descriptions of his mental impairments.  The ALJ

_____

[23] The Medical-Vocational Guidelines, also known as the "grids," reflect major functional and vocational patterns encountered in cases which cannot be evaluated on medical consideration alone, where an individual with a severe medically determinable impairment is not engaging in substantial gainful activity and the individual's impairment prevents the performance of his or her vocationally relevant past work.  The grids also reflect the analysis of the various vocational factors (i.e., age, education, and work experience) in combination with the individual's residual functional capacity (used to determine his or her maximum sustained work capability for sedentary, light, medium, heavy, or very heavy work) in evaluating the individual's ability to engage in substantial gainful activity in other than his or her vocationally relevant past work.  20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00.  When the limitations and restrictions imposed by a claimant's impairment and related symptoms such as pain, affect only his or her ability to meet strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), the Commissioner considers that the claimant has only exertional limitations.  When a claimant's impairments and related symptoms only impose exertional limitations and a claimant's specific vocational profile is listed in a rule contained in appendix 2 of the Commissioner's regulations, the Commissioner will directly apply that rule to decide whether a claimant is disabled.  20 C.F.R. § 416.969a(b).

noted the inconsistency in Dr. Herman's report in which Kennedy claimed being drug-free for 90 days despite his admission for drug rehabilitation only a month before.  (Tr. 36).  The ALJ credited the testimony of Dr. Saul, which was supported by medical evidence, including Kennedy's treatment history.  (Tr. 36).  The ALJ noted Kennedy's Belmont hospitalizations and mental health problems occurred after substance abuse.  (Tr. 36).

Dr. Herman's opinions were rejected because his "conclusion of serious mental impairment" conflicted with Dr. Herman's observations of Kennedy.  (Tr. 36).  Dr. Herman's opinion relied wholly on Kennedy's statements, which often conflicted with the evidence, and were much more "drastic" than those of Kennedy's treating physicians at WES.  Kennedy's WES physicians noted Kennedy was:  not hearing voices, or expressing suicidal or homicidal thoughts; able to leave his home, attend therapy, and was feeling better or "cool" with medication.  (Tr. 36).  This led the ALJ to only partially credit Kennedy's subjective complaints, but he found Kennedy is not foreclosed from all work.  (Tr. 38, Finding 3).

## DISCUSSION

A.  Legal Standard

I must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  The factual findings of the Commissioner must be accepted as conclusive, if they are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); Rutherford, 399 F.3d at 552.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB,

305 U.S. 197, 229 (1938)); <u>Reefer v. Barnhart</u>, 326 F.3d 376, 379 (3d Cir. 2003). It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." <u>Rutherford</u>, 399 F.3d at 552. I may not weigh the evidence or substitute my own conclusions for that of the ALJ. <u>Burns v. Barnhart</u>, 312 F.3d 113, 118 (3d Cir. 2002). If the ALJ's findings of fact are supported by substantial evidence, I am bound by those findings, even if I would have decided the factual inquiry differently. <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001). At the same time, however, I must remain mindful that "leniency [should] be shown in establishing claimant's disability." <u>Reefer</u>, 326 F.3d at 379 (quoting <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979)).

The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims. This five-step evaluation is codified at 20 C.F.R. § 416.920.[24]

---

[24] These steps are summarized as follows:

1. If the claimant is working or doing substantial gainful activity, a finding of not disabled is directed. If not, proceed to Step 2. 20 C.F.R. § 416.920(b).

2. If the claimant is found not to have a severe impairment which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed. If there is a severe impairment, proceed to Step 3. 20 C.F.R. § 416.920(c).

3. If the impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 of Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed. If not, proceed to Step 4. 20 C.F.R. § 416.920(d).

4. If the claimant retains residual functional capacity to perform past relevant work, a finding of not disabled is directed. If it is determined that the claimant cannot do the kind of work he or she performed in the past, proceed to Step 5. 20 C.F.R. § 416.920(e).

5. The Commissioner will then consider the claimant's residual functional capacity, age, education, and past work experience in conjunction with the criteria listed in Appendix 2 to determine if the claimant is or is not disabled. 20 C.F.R. § 416.920(f).

A claimant is disabled if he is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. § 416.920.  The claimant satisfies his burden by showing an inability to return to his past relevant work.  Rutherford, 399 F.3d at 551.  Once this showing is made, the burden shifts to the Commissioner to show the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  20 C.F.R. § 416.920; see Rutherford, 399 F.3d at 551.

The ALJ may not make speculative inferences from medical evidence, see e.g., Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), but may reject conflicting medical evidence. Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992).  When a conflict in the evidence exists, the ALJ may choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason."  Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993); accord Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).  The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects.  See Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d. Cir. 1983).

B.  Kennedy's Claims

Kennedy challenges the ALJ's decision on multiple grounds: (1) the ALJ improperly ignored Kennedy's testimony about his paranoia, depression, and PTSD; (2) the ALJ improperly relied on the testimony of Dr. Saul, a non-treating psychiatric expert, while he discredited and

---

See also Knepp v. Apfel, 204 F.3d 78, 83-84 (3d Cir. 2000) (citing Santise v. Schweiker, 676 F.2d 925, 926-27 (3d Cir. 1982)).

attached less weight to the testimony of treating physicians, primarily at Belmont, and Dr. Herman, a non-treating examining physician; (3) the ALJ failed to properly develop the record when he did not provide Dr. Koff, a medical consultant, with x-rays; and (4) the vocational expert's testimony was not credible.

### 1. Kennedy's Credibility

Kennedy claims the ALJ wholly ignored his testimony concerning his depression, paranoia, and PTSD, and his subjective complaints were consistent with the medical evidence. The ALJ had substantial evidence to reject Kennedy's subjective claims, therefore, these claims lack merit.

The ALJ must seriously consider subjective complaints of pain, which may support a claim for benefits, especially when the complaints are supported by medical evidence. Smith, 637 F.2d at 972; Taylor v. Harris, 667 F.2d 412 (3d Cir. 1981); see also Mason, 994 F.2d at 1067; 20 C.F.R. § 416.929(c)(1). Subjective complaints of pain must bear some relationship to the claimant's physical status, as demonstrated by objective medical findings, diagnoses, and opinion. 20 C.F.R. §§ 416.926; 416.929; see also Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974).

An ALJ may discredit a claimant's complaints when: (1) there is contrary medical evidence in the record, and (2) the ALJ explains the basis for rejecting the complaints. Mason, 994 F.2d at 1067. Relevant factors in evaluating subjective complaints include: Kennedy's daily activities; the location, duration, frequency, and intensity of symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication Kennedy takes or has taken to alleviate his symptoms; treatment, other than medication, Kennedy receives

or has received for relief; any measures Kennedy uses or has used to relieve his symptoms; and other factors concerning functional limitations and restrictions due to symptoms.  20 C.F.R. § 416.929(c)(3); SSR 96-7p.

Although credibility determinations are normally entitled to deference, I must nevertheless exercise meaningful review.  Cao v. United States, 407 F.3d 146, 152 (3d Cir. 2005).  The reasons for credibility findings must be substantial and bear a legitimate nexus to the findings, e.g., based on inconsistent statements, contradictory evidence, or inherently improbable testimony.  Id.; accord St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) (an ALJ's credibility determination should not be reversed unless "inherently incredible or patently unreasonable" as long as ALJ considers all relevant factors and explains his decision).

To some extent the ALJ credited Kennedy's subjective complaints concerning his mental impairments when he recognized Kennedy could not interact with the public, could have only minimal interaction with coworkers and supervisors, required a low-stress workplace, and required a stable work environment with no more than occasional changes.  The ALJ properly stated a clear and reasonable basis for discrediting other aspects of Kennedy's claim he could not function around anyone.

The ALJ cited Kennedy's relationship with a girlfriend, his ability to use public transportation, and attend therapy sessions, in discounting Kennedy's claims that he cannot be around other people due to depression, paranoia, and PTSD.  Moreover, the ALJ properly noted the inconsistencies in statements Kennedy made to physicians, e.g., Kennedy's claim to Dr. Herman that he was alcohol and drug free for 90 days when Kennedy had received inpatient

substance abuse treatment only a month earlier.[25]  Kennedy's ability to interact with a girlfriend,

to use public transportation and attend therapy sessions, along with his inconsistent statements,

bore a legitimate connection to the ALJ's findings.

### 2. Reliance on Non-treating Physician

Kennedy contends the ALJ improperly relied on the opinion of Dr. Saul, an independent

psychiatric expert, while discrediting the opinions of treating sources, especially those at

Belmont.  This claim lacks merit because the ALJ properly weighed the medical evidence and

had substantial evidence upon which to base his decision that Kennedy's mental impairments do

not preclude him from all work.

Enhanced weight is generally given to the findings and opinions of treating physicians, 20

C.F.R. § 416.927(d)(2); Rutherford, 399 F.3d at 54 (citing Mason, 994 F.2d at 1067), especially

when their opinions "reflect expert judgment over a prolonged period of time."  Plummer, 186

F.3d at 429 (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)).  Yet, the ALJ has

discretion to dismiss or discount a treating physician's opinion.

A treating physician's opinion may be rejected  "only on the basis of contradictory

medical evidence," although the opinion may be accorded "more or less weight depending upon

the extent to which supporting explanations are provided."  Plummer, 186 F.3d at 429.  The

---

[25] Although the ALJ did not mention every inconsistency in the record in discounting
Kennedy's statements, there is much to choose from.  For example, Kennedy told differing stories
about his past work history, the time period he stopped working, his attacker, and his drug usage.
Moreover, at the hearing Kennedy explained he was paranoid of people prior to being stabbed in
2002, and was only able to work at the "metal place" because he had a secluded work location.
Yet, Kennedy's application for benefits did not list any mental impairment that had limited his
ability to work, and Kennedy first sought mental health treatment in 2003 - - a year after the
stabbing.

ALJ is not bound by a physician's statement of disability and may reject it if there is a lack of data supporting it, <u>Newhouse v. Heckler</u>, 753 F.2d 283, 285 (3d. Cir. 1985), or there is contrary medial evidence, <u>Frankenfield v. Bowen</u>, 861 F.2d 405, 408 (3d Cir. 1988).  The weight given to a physician's opinion depends on the extent to which it is supported by clinically acceptable medical data and laboratory medical techniques.  <u>Coria v. Heckler</u>, 750 F.2d 245, 247 (3d Cir. 1984).  "While the ALJ is, of course, not bound to accept physicians' conclusions, he may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected."  <u>Kent v. Schweiker</u>, 710 F.2d 110, 115 n.4 (3d Cir. 1983).  Thus, the ALJ may choose to reject a treating physician's assessment if it conflicts with other medical evidence, the ALJ clearly explains his reasons for rejecting the assessment, and he makes a clear record of his decision.  <u>See</u> <u>generally</u> <u>Rivera v. Barnhart</u>, 2005 WL 713347, slip op. at *5 (E.D. Pa. March 24, 2005) (collecting authorities); <u>Jones v. Sullivan</u>, 954 F.2d 125, 129 (3d Cir. 1991).

Here, the record is replete with conflicting medical evidence.  As in most mental health cases, evidence of Kennedy's mental impairments was primarily derived from Kennedy's subjective complaints to his treating and consulting physicians.  Relying on such evidence is challenging here because it is inextricably intertwined with Kennedy's credibility, and he gave contradictory statements about basic facts his physicians.  For instance, the record shows Kennedy has three vastly different stories concerning his stabbing: at the hearing, he implicated his wife; at WES, he blamed his girlfriend; and he told a consulting physician a stranger stabbed

him.[26]  As a result, the ALJ had substantial evidence to support his decision.

The ALJ accepted, and classified as severe impairments, an affective disorder, an anxiety-related disorder, and a substance addiction disorder.  Yet, disability is determined by the functional restrictions an impairment has on an individual, not merely the presence of a severe impairment.[27]  Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991).

Essentially, the ALJ was presented with one set of treating source records, from WES, classifying Kennedy's limitations as moderate, and another of records, from Belmont, listing Kennedy's limitations as moderate to extreme.  The major distinction, however, is that Kennedy was admitted to Belmont while abusing alcohol and drugs, but his treatment at WES appears unrelated to any substance abuse.  Moreover, Kennedy's two non-treating sources reached opposite conclusions:  Dr. Herman cited marked-to-extreme limitations on Kennedy's ability to work, whereas, Dr. Saul deemed the limitations less severe.

By relying on Dr. Saul, the ALJ declined to base a disability finding on Kennedy's Belmont treatment, which had followed instances of substance abuse.  When admitted to Belmont, Kennedy was suffering severe mental health problems, yet, after abstaining from alcohol and drugs, participating in therapy, and taking his prescribed medication, the Belmont records show Kennedy had only moderate limitations.  Kennedy's reliance on Belmont's diagnosis of his psychosis cannot be viewed in a vacuum.  Rather, as Dr. Saul advised the ALJ, it

---

[26] Because Kennedy's PTSD arose from his stabbing, his conflicting versions are highly relevant to resolving his mental health issues.

[27] The ALJ's reference to an anxiety-related disorder and affective disorder, and not PTSD, is of no consequence because the ALJ addressed the underlying limitations cited by the treating sources who diagnosed PTSD

must be viewed in the context of Kennedy's full medical history, which is often shrouded in episodes of substance abuse.

Contrary to Kennedy's claim, the ALJ was not obligated to formally classify Kennedy's substance abuse as "secondary" to an underlying psychosis.  By explaining his rationale for crediting Dr. Saul's testimony in light of Kennedy's history, the ALJ had a sufficient basis to conclude Kennedy's most significant mental limitations were "largely attributable to substance abuse."  (Tr. 36).  Viewed as such, neither the ALJ, nor Dr. Saul, ignored the Belmont records, as Kennedy now claims, in concluding Kennedy's impairment failed to satisfy the Listing.  The ALJ properly concluded Kennedy had ongoing mental health impairments but they were not disabling as long as Kennedy adhered to the treatment regimen prescribed by his treating psychiatrists at Belmont.

Similarly, in discounting Dr. Herman's opinion, the ALJ noted Dr. Herman examined Kennedy only once, relied entirely on Kennedy's subjective complaints, which featured inaccurate statements and inconsistencies.[28]  The ALJ weighed Dr. Herman's opinion against the opinions of treating physicians, including the WES records, the opinion of Dr. Saul, and the remaining evidence in the record and chose to reject the drastic conclusions finding marked-to-severe limitations.

Dr. Saul's testimony was supported by the WES notes which showed Kennedy could leave his home, regularly attend therapy, and had improved with medication.  Along with the Belmont discharge records listing only moderate limitations with medication and therapy, this

---

[28] In addition, Dr. Herman checked the box for "marked" limitation for "interact appropriately with public," but checked "extreme" in the respective boxes for supervisors and coworkers.  (Tr. 234).

evidence provided the ALJ with substantial evidence to support his decision.[29]

Dr. Herman was not a treating physician, whose opinion merited greater weight.  In any event, the ALJ properly identified the multiple ways Dr. Herman's opinion conflicted with the evidence in the record and amply explained his reasons for rejecting the opinions.  Moreover, Dr. Herman's use of a check-box form to indicate Kennedy's functional limitations merits little weight.  See Mason, 994 F.2d at 1065 (reports involving a check-box or fill-in-the-blank form constitute weak evidence at best).  Kennedy now concedes "that there are great defects in the testimony of Dr. Herman."  (Pl.'s Resp. Br. at 1).

### 3.  Failure to Develop the Record

Kennedy claims the ALJ failed to fully develop the record when additional x-rays were not provided to Dr. Koff, a medical consultant who examined Kennedy for the state agency.  The ALJ addressed this contention, stating:

---

[29] Kennedy also seeks a remand for consideration of evidence from Dr. Thomas Richardson, who treated Kennedy from October, 2004 until April 6, 2005.  Kennedy claims Dr. Richardson's report, which was submitted to the Appeals Council, but concerns treatment after the ALJ's decision, shows his mental health problems are independent of his substance abuse.  The new evidence does not warrant a remand.

Although evidence considered by the Appeals Council, but not by the ALJ, may become part of the administrative record on appeal, it may not be considered in a substantial evidence review.  Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001).  Only the record developed before the ALJ may be considered.  Id. (citing Eads v. Sec'y of HHS, 983 F.2d 815, 817 (7th Cir. 1993)).  Remand is justified only upon a showing that the evidence is new, material, and there was good cause for not presenting it to the ALJ at or before the hearing.  Szubak v. Sec'y of HHS, 745 F.2d 831, 833 (3d Cir. 1984); 42 U.S.C. §405(g).

Kennedy's new evidence concerns a period after the hearing date.  This new evidence is cumulative.  Although Dr. Richardson "feels" Kennedy was not employable as of April 6, 2005, a day earlier his treatment notes demonstrate Kennedy was working part-time with his friend.  On April 15, 2004, Kennedy reported his mood was better, and nightmares and flashbacks were much better.  Later in 2004, Kennedy reported he has more good days than bad, and with the program and medicine he is far better.  This new evidence ilustrates the same types of inconsistencies the ALJ relied upon to discount Kennedy's other treating sources.

There is no need to return the claimant's chest x-ray to Dr. Koff for his evaluation, as the claimant requested. Dr. Koff is not the claimant's treating physician. The evidence from the claimant's treating physician does not show that he regarded the residual effects of the claimant's lung injury as serious. Pulmonary function testing confirms that it is not. The claimant's medical treatment since the stabbing also shows that his impairment is only moderately severe. The claimant has been able to resume normal activity with the aid of medication. He shops, does light housework, cooks, and he does minor repairs. He also does his laundry... He can take public transportation, and he can care for himself.

(Tr. 35).

The ALJ adequately developed the record. See Rutherford, 399 F.3d at 557; Boone v. Barnhart, 353 F.3d 203, 208 n. 11 (3d Cir. 2004); see also Roman ex. rel. K.M.J. v. Barnhart, 2006 WL 516769 (E.D. Pa. Feb. 28, 2006) (Pratter, J.). The record featured substantial evidence that Kennedy's impairment was moderately severe, including his treating physicians and Kennedy's daily activities. Any interpretation by a non-treating source such as Dr. Koff could not outweigh such highly probative evidence.[30]

4. Credibility of Vocational Expert's Testimony

Kennedy alleges the vocational expert's testimony was not credible when she described jobs having limited contact with coworkers and supervisors because Dr. Saul opined Kennedy

---

[30] Kennedy does not explicitly challenge the ALJ's credibility findings concerning his physical impairments. In any event, the ALJ properly weighed Kennedy's credibility relating to his respiratory impairments. The ALJ noted Kennedy is able to shop, do light housework, cook, do minor repairs, do his laundry, take public transportation, and care for himself. (Tr. 35). Moreover, the ALJ discounted Kennedy's claim that his asthma had become worse by pointing to medical evidence showing Kennedy mostly outgrew his asthma, rarely uses his nebulizer, and has not had any emergency room visits in many years. (Tr. 35). The ALJ also relied upon a treating physician's report advising Kennedy to resume normal activity and another report showing Kennedy's respiratory impairment as only moderately severe. (Tr. 35). This explanation is more than sufficient to allow the ALJ to discount Kennedy's testimony regarding his physical impairments. Although discounting some of Kennedy's testimony, the ALJ incorporated environmental and exertional limitations in Kennedy's RFC.

should work without contact with the public or coworkers.  This allegation misstates the testimony of Dr Saul, who said Kennedy should not have "much" contact with coworkers and the public.  (Tr. 299).  Kennedy also claims the vocational expert's testimony about job site variation shows the vocational expert never actually identified how many jobs meet Kennedy's limitations. This claim is without merit.

There is no requirement that every impairment alleged by the claimant be submitted to the vocational expert in the hypothetical question.  Rutherford, 399 F.3d at 554.  The ALJ must accurately convey to the vocational expert all of a claimant's limitations that are credibly established.  Id. (citing Plummer, 186 F.3d at 431); accord Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d. Cir. 1987).  Limitations that are medically supported, but contradicted by other evidence, may or may not be credited by the ALJ and included in the hypothetical question. Rutherford, 399 F.3d at 554.

The ALJ's hypothetical featured Kennedy's credibly demonstrated limitations, including exertional limitations caused by respiratory impairments and non-exertional limitations such as: a stable, low-stress work environment; simple one- or two-step tasks; occasional lapses in concentration; no interaction with the public; and only occasional interaction with coworkers and supervisors.

The ALJ was not required to include more drastic exertional limitations because Kennedy acknowledged he could shop, take public transportation, do his laundry and chores, and do minor repairs.  Kennedy's treating sources, on multiple occasions, advised Kennedy to return to normal activities.  (Tr. 165, 265).  The hypothetical was also consistent with Kennedy's mental limitations.  Kennedy is able to keep a girlfriend, interact with others at group therapy, and take

public transportation.  Although he prefers to be alone, he can get along with others, and his mental health impairment improves with medication.[31]  The ALJ's hypothetical was proper and required limited interaction with coworkers and supervisors.  Accordingly, the testimony of the vocational expert was credible in stating the hypothetical worker could perform two jobs with numerous positions in the national economy.

---

[31] Contrary to Kennedy's assertion, the ALJ's inquiry is not whether medications cure Kennedy's underlying psychosis, it is whether psychosis can be treated to allow Kennedy to work.  Kennedy concedes his medications "made him better."  (Pl.'s Resp. Br. at 4).

Accordingly, I make the following:

<u>RECOMMENDATION</u>

AND NOW, this 24th day of April, 2006, it is respectfully recommended that Kennedy's motion for summary judgment be DENIED, and the Commissioner's motion for summary judgment be GRANTED.

BY THE COURT:


/S/_____
TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE